numbers 15-1184-1187, 1274, 1323, and 1342. And I have here Mr. Refson, Mr. Sorensen, Mr. Refson. I represent the individual retailer plaintiffs, in particular CDS and Rite-Aid. I have nine minutes and I'd like to reserve two minutes of my time for rebuttal. Two of the other plaintiffs are going to argue about particulars with respect to their own place. I'll bet you can guess where we're going to start. I do, and let me see if I can predict it. I'd like to begin with the difference between a claim and a theory. No, no, no, no, no. I was wrong. Let's try Rule 54B. Okay, we can start with Rule 54B. At one point I'd like to return to that claim versus theory issue. I'll get you there, I promise. But let's start with the 54B issue. That is a difference between the Lipitor case and the Effexor case. There was a Rule 54B motion that the plaintiffs filed after Judge Sheridan decided to dismiss the activist claim in this case. The defendants say that because we asked for a Rule 54B certification to take that issue to this court, that therefore jurisdiction is a stop. They say we're admitted in those papers that we're only required... Well, you can't stop your way to jurisdiction, right? That was my first point. But let's put that aside. You treated this as a claim earlier, right? Did the district court agree with you? Well, yes. What we admitted was a claim was the reverse payment claim, the conspiracy claim under Section 1 of the Sherman Act. We had a claim that we asserted in Claim 2 of our complaint against Wyeth and Teva for conspiracy, to violate Section 1 of the Sherman Act. And that's the claim that was certified under Rule 54B. What we said in our papers in support of the motion was that we still had a remaining claim, the monopolization claim under Section 2 of the Sherman Act, that would remain after certification of the 54B motion. And the reason that that claim that was remaining, the reason why we referred to that as a Walker process claim at that point was because that's the piece that was remaining. Originally, if you look at Claim 1, and this is where I wanted to start, but if you look at Claim 1... Are you in effect saying that the district court erred in treating this as a 54B? Not at all. I mean, Claim... Rule 54B... Because, in effect, you were asking the district court to deal with it under 54B, did you not? Yes, we did ask for 54B certification. Because 54B speaks plainly to claims. Right. And Claim 2, which only involved Wyeth and Teva, was completely resolved by the dismissal of the reverse payment theory. That was the only theory under Claim 2 of our complaint. And that's the theory that we asked to be certified to this court. And also, when we asked for that certification, what we said was that Claim 1, the only theories left in Claim 1, after Judge Sherton's opinion, were the patent-related theories. But the theories that are left do not determine this court's jurisdiction. You have to look at that claim as originally pled. And if you look at our complaints as originally pled, before Judge Sherton dismissed the activist theory, the settlement theories, that claim against Wyeth alone consisted both of patent-related theories and settlement-related theories. And what we were talking about in that Rule 54B motion was, after Judge Sherton issued his opinion, what you had left in Claim 1 were patent-related theories. But Claim 2, the settlement theories under activist, were completely over. And there was no just reason for delay for this court to decide the reverse payment theories. But you're saying that Claim 1, which was the Sherman Act monopolization claim, all right? Claim 1 was the monopolization claim. You're saying that was the monopolization claim. Claim 1, not Claim 2, Claim 1 is the Section 2 Sherman Act claim. Yes, Your Honor. But you're saying that the only thing that you had left in that was the Walker Process theories in that claim. Yes, Your Honor. Am I using the right word? Claim 1 was a monopolization claim under Section 2 of the Sherman Act. Correct. And I think part of the confusion here is we've gotten away from looking at what's pled in the complaints. And I would just like to point out what was pled in the complaints. I'm going to use my client's complaint. And this is the CBS Rite Aid complaint. And I'm looking at Joint Appendix page 729. And there's a page there that says Claims for Relief. The Claims for Relief are defined in the complaint. And then there's a title right under there that says First Claim for Relief. And the next subheading is Unlawful Monopolization 15 U.S.C. Section 2. That's Section 2 of the Sherman Act. And then we plead that claim. And we say in Paragraph 336, we define the different theories under which we're proceeding. And in Paragraph 336, we plead this claim against Wyeth. And we say it consists of five acts or what we're calling now theories. And the acts are obtaining three patents by fraud, improperly listing the patents, engaging in sham litigation, and then four, entering into independently unlawful settlement agreement with Teva that further delayed generic entry, and finally negotiating settlements with subsequent generic applicants to preserve and protect its monopoly and the market division agreement negotiated with Teva. After Judge Sherton decided to dismiss the activist theories, that claim only consisted of Are you saying that what Judge Sherton dismissed was the activist theories as they applied to both Claim 1 and Claim 2? Yes. Okay. But the Rule 54B certification by necessity could only refer to Claim 2 because it resolved Claim 2 because it dismissed that claim entirely because there was only one theory under that claim. Gotcha. And it also disposed of all claims against Teva because Claim 1 applied to only Wyeth. So that Claim 1, in effect, became a Walker process-based claim because the only theories left under Claim 1 were patent-related theories. So if you're correct on the merits of your appeal that Judge Sherton was wrong in dismissing the activist claims, the two claims remaining would both have non-patent rule law theories. Exactly, Judge Fischer. That Claim 1 is then going to involve both the patent-related theories and the activist settlement theory. But that activist theory, in effect, is before this Court through Claim 2 because that disposed of all claims against Teva. Okay. The one claims versus theories. Why don't you touch on that? Okay. That's okay. You're on time. Okay. Thank you, Your Honor. I did want to address this difference between claims versus theory that arose in the Lipitor case. And I believe that the proper place to define what's a claim versus a theory has to be in the complaint itself. And I did a little bit in discussing the Rule 54b motion. But I think you have to read the complaints to determine what the plaintiff pled as the master of the complaint to determine whether you're talking about a claim or a theory. And if you look, and again, I'm going to turn to my client's complaints, but I don't think anybody has suggested that any of the complaints are different in this respect. But from the very beginning of our complaint, we describe the claims that we're asserting. And this is in Paragraph 1 of the CVS Right Aid complaint. And this is Page 647 of the Joint Appendix. And we describe what the action is all about. We say, this is an action challenging an unlawful and anti-competitive scheme by Defendant Wyeth to maintain monopoly power and delay the entry with generic versions of Wyeth's Effexor XR and encapsulated extended release version of the compound venlafaxine hydrochloride. And then we say, including an independently unlawful agreement between Wyeth and Defendant Pharmaceuticals USA, Inc. And then as you trace that throughout the entire complaint, we continue that theory. We have a monopolization claim, and then we have an independent claim. And part of that claim involves the settlement, but we also assert an independent claim against both Wyeth and Teva. And you see that on the page that I pointed out before when you get to the actual claims in our complaint. We have first the monopolization claim, and then we have a settlement-based claim that involves both Wyeth and Teva. We do think that if the court defined the claims and the theories any differently than the way we cited, we did it in the complaint, that that would violate the well-pleaded complaint rule. We also think that it would be inconsistent with both the Supreme Court in Christensen and the Second Circuit in DDAVP. Both of those cases talked about the claims as the monopolization claim and then discussed the various theories under those claims. And they're essentially the same as what we have here. I mean, in Christensen, the court talked about the monopolization claim. It was supported by two different theories, one which involved claims of patent invalidity, patent misstatements because there was patent fraud, and then the other one dealt with authorization. Those acts both happened at different times, which is what the defendants are saying here, that our different theories happened at different times. So that can't be the distinguishing feature between claims and theories. And you have the same thing in DDAVP, where there was an overall monopolization claim supported by different theories, some of which involved patent fraud, which happened early in time, and others that happened later in time with the citizen's petition. So the timing of the events can't be the distinction. When you define what the operative facts are in support of the claim, you have to look at what the plaintiffs pled. What we pled was an overall scheme, and that scheme included a settlement. Are you alleging that the monopolization period here was, what, June of 08 to July of 10? Is that right? Yes. And if all the theories are correct, you get that entire period. It might be necessary if we lose some of the theories, that that period might change, but that doesn't separate the fact that we pled an overall scheme that supported our damages. All right. Thank you very much. Thank you. Mr. Sorensen? Mr. Chairman, just briefly, with respect to the 54B, I do just want to add that in the district court, we did explain quite clearly what Mr. Refson just articulated, that we did not believe that jurisdiction lied to the Federal Circuit over a fixer. And I cite JA1375 and JA1383, and these were briefs, letter briefs, and a brief submitted in 2012 where we set forth very clearly our view, as Mr. Refson articulated, that we did not believe the Federal Circuit had jurisdiction over this case. I want to make it clear that the direct class complaint is similar to the complaints that you just heard about, and I point you to Count 1 JA238, which is the Section 2 claim, and Count 2, which is the one that was dismissed up on 54B, a JA241. So it's similar. Your Honor, also I mentioned earlier Gunn v. Minton, and I want to just point out that after the Gunn v. Minton 2013 case, it is not clear or obvious that even if there are patent issues that arise in an antitrust case such as this, that they are substantial enough to warrant Federal Circuit exclusive jurisdiction. In Gunn, the Supreme Court put a lot of teeth behind the substantial part of that. Now, if that was a legal malpractice case, that's true, but the Court took pains to explain that for purposes of Federal Circuit jurisdiction, the substantial requirement has real meaning. That is, it has to be something more than applicable to the parties and the patents at issue. I cite pages 1067 and 768 of the opinion where the Court states, quote, but even assuming that a state court's case within a case adjudication may be preclusive under some circumstances, the result would be limited to the parties and patents that have been before the state court. Such fact-bound and situation-specific effects are not sufficient to establish Federal arising under jurisdiction. I simply point that out to say that even if the Court determines to rewrite the complaint, which we think is not supportable, and pull out Walker Process allegations and turn them into a separate stand-alone claim, which is not how the plaintiffs fled it, it is not clear after Gunn that even if you do that, it's sufficient to invest exclusive jurisdiction in the Federal Circuit. You then have to grapple with Gunn and find that's a substantial question of patent law in light of Gunn, and I don't think that's an easy or obvious question. And the language that I just cited to you would suggest the answer is no. And that Gunn is saying to all the courts, Federal Circuit jurisdiction is still there and designed for actual patent cases. They use the phrase actual or live patent cases several times. There are plenty of those. They arise all the time. And the Federal Circuit has plenty of opportunity to grapple with issues in those actual cases. The fact that patent issues touch and arise in various ways in antitrust cases is true, but as Justice Stevens said in the Holmes case, the fact that other circuits, this circuit, other circuits, sometimes make decisions touching on patent issues is a good thing, can be what Justice Stevens said can be an antidote to the potential long-term institutional bias of the Federal Circuit. I'm quoting him. I'm not criticizing the Federal Circuit, but he pointed that out, and I think that is also something to keep in mind. So you're saying the Federal Circuit should be dissolved? I'm sorry? You're saying the Federal Circuit should be dissolved? It's been around since 83, right? I don't think I want to go there. I have nothing else. I'm not sure you want to go there either. All right. Thank you, Mr. Checkey. Thank you, Judge. I'll be brief, Judge. I was looking for the appropriate metaphor for my presentation on the last. I think the substantiality issue that my colleague just mentioned in Gunvey-Mitton goes to developing a uniform body of patent law for the Federal Circuit, and I don't think that that policy implication or policy objective is implicated here, given the status of this appeal. I would also just like to note that, in my judgment, there's another policy issue which we haven't touched. We briefly touched in the impayer's brief, which is the reverse payment theory, which is before your Honor under, I pronounce it, Actavius as well, although Judge Sheridan sort of made it Roman. He would say Activus or Actavius. But I think the policy issue, there's another policy issue, which is the development of uniform Third Circuit antitrust law, because on this appeal we think, at least the impayers and my colleagues think, that that issue should be decided by your Honors, and that's a public policy that you should consider when you're writing the opinion as well. Thank you, Judge. Thank you. Mr. Lefkowitz, welcome back. Thank you, Your Honor. Can we start with the 54B issue, just to see if we can deal with that? Sure. Under Christensen and the well-pleaded complaint rule, there is an argument that we should look only to the complaint to determine the nature and extent of the plaintiff's claims. So under that theory, bad word, why does the 54B ruling matter? I think the 54B is important because it explains how the plaintiffs themselves understood their complaint. They described it, and, in fact, they asked the court to rely on their descriptions of it when they called it a claim. Now, I'm going to go to the complaint, because I think that's still the operative document, and we should focus on that. But, again, we're not talking about estoppel in the sense of creating subject matter jurisdiction. First of all, this isn't even a question about subject matter jurisdiction. It's a question about which appellate court has jurisdiction. But I think when a party makes a representation to a court, and the court relies on that representation, I think that's actually quite significant. But what's most significant is not whether there's estoppel as a legal matter or not. It's the way they describe this. When they say none of the issues plaintiffs seek to bring before the Third Circuit with regard to Count 2, the reverse payment claim, overlapped with the remaining issues in the case, the Walker process claim, they're being very clear, and as I'd like to do when I go to the complaint, I'll show you that there's actually no way to read the complaint accurately, literally, without seeing that they're correct. The problem I have is that at least one or more places in your brief, you say that the plaintiff's characterization of claims doesn't control, but rather our interpretation of the complaint itself. It seems like you're still saying that right now. Is that correct? I still think, ultimately, Your Honor, that you have to look at the well-pleaded complaint. But I think it is very – if you have any question about how to read that complaint, the best way to understand it is not only to look at what the plaintiff's represented, but also how the court relied on it. And in particular, with respect to the question we talked about in the liberatory issue, which was the scope of relief. Because, again, that's the fundamental question when you're trying to look at whether what they say is left behind in the trial court is just merely a theory or a different claim. And, of course, here's what they say in their Rule 54b motion. They say, if plaintiffs win under count one, the period of delay would likely run from the expiration of the husband's patent, which they dated June 13, 2008. And then they say, if plaintiffs win under count two, the period of delay would likely run from the date on which the jury determines Teva would have come to market, a date that could be later than June 13, 2008. Again, what they have said is left behind is not only a separate claim, and I'll show you from the complaint that it's a separate claim, but it gives rise to – Don't both of those sound a bit like monopolization as opposed to – Walker process occurred way before that, many years before that. And they need to prevail on their Walker process in order to get the earliest date of relief. Let's look at what they say in their – Not necessarily. Well, strike that. The question we are – is before us is the jurisdiction of our court. Okay. And as I understand it, when Mr. Refson was up in front of us, he said that our reversal, in this case, would return an Act Teva's claim to both counts. That's what he said. That's what he said. So if both of those counts slash claims have antitrust claims under Christensen, we still have jurisdiction. No. How do you disagree with what would be in claim one if we reversed on the merits? If you reversed on the merits, you still would go back and have a Walker process claim as part of their count in the case under – I guess it's section two. Count one, section two. And that would give rise to a longer damages period than all of the rest of the case. Everything that you would potentially reverse would give rise to one. But they couldn't – okay. You couldn't get the overall relief that they are seeking without the Walker process claim. But essentially, Act Teva's changed the landscape when the Supreme Court said you can make antitrust claims. You can make antitrust claims on patent cases. And because you can make an antitrust claim on a patent case, you can go all the way back to the time of filing. But the fact that there's a non-patent claim, non-patent theory in there, it gives us jurisdiction. Well, the Supreme Court – That's the issue. No, it doesn't give – but Your Honor – That's the issue. But the Supreme Court's decision in Act Teva's doesn't in any way change the inquiry of whether in this complaint, in this well-pleaded complaint, there is a question of law that the trial court ultimately has to resolve to give them the full measure of their relief, which has to run through an important question of federal patent law. I understand there's an important question of federal antitrust law, and maybe they have more running room. But I think the problem is that under Christensen, under Christensen, that doesn't get you out of here and get you to the federal circuit. It does, Your Honor, if it is a separate claim and it is a claim on which they have to prevail. Remember what Christensen said. Christensen said because there were – To be successful on your theory, you have to argue that even if we reversed on the merits, or if we reversed on the merits, there would be no Act Teva's claim remaining in claim number one with a section two foundation. No, absolutely not, Your Honor. There could – you could conceive of this as having two different claims for monopolization. I think a fair reading of the complaint, which I'd like to get to, shows that there actually isn't even a separate claim for reverse payment, that the entire second claim is actually just the Walker Process claim as they – That's different. But even if there is, that doesn't get rid of the fact that there is still a Walker Process claim. If you've got two claims there, and one is clean Act Teva's, and the other involves Walker Process, the result jurisdictionally is what? The result depends on whether or not you can get the full relief without the patent question. If you can get the full relief without the patent question, then I think we have a different story. But because the Walker Process issue is what gives rise to the full measure of relief, there is no way that they can get the relief that they are seeking in this case. They may be able to get a portion of the relief without patent issues, but if you just read their complaint, and if you read what the court said, and if you read what they say in their Rule 54, they make clear that to get the full measure of relief, you have to invalidate that patent. Otherwise, the damages at the earliest start later. And that is why you have a separate claim. And in fact, if you think about the way they're arguing it, the only thing left below right now is a claim that Teva is not even a party to. It is a claim just against Wyatt. How is that not an independent claim in this complaint? If you're correct, and let's assume that your argument is correct for a second, and if you were in the Second Circuit, wouldn't the Second Circuit be saying, we already decided this question in SIPRA? In SIPRA, the Second Circuit sent the case. No, no, no. In the SIPRA case that the Second Circuit decided, there was no Walker Process claim. The only case, and this is actually critical, if you go back and you look, there were two different appeals out of SIPRA. There were a bunch of complaints that raised Walker Process, and those appeals went up to the Federal Circuit. There was one complaint, I think it was from the end payers in that case, that only had a reverse payment claim. They didn't allege Walker Process fraud. And so, of course, if there were no allegation of Walker Process fraud, there'd be no patent issue, and the case would go to the Regional Circuit. I'd like, if I may, Your Honor, to look at what they allege in the complaint. I think we should prevail, even under your articulation of what would be left, because even if you look at the monopolization claim and you say, well, there is a reverse payment claim in it, there's still a Walker Process claim, and that in and of itself, given the scope of the requested relief, has to trigger under Christiansen. How much more time do you need? Thirty seconds, if I may. I'll tell you what. Give him three minutes. Thirty seconds is never thirty seconds. I learned that as a lawyer. Thank you, Your Honor. I appreciate that. I want to focus the Court's attention on paragraph 410 of the direct purchase system complaint. Here's how they describe the scheme. They have A, B, C, D, and E. They have five elements of the scheme. The first is A, obtaining the 171, 958, and 120 patents by misleading the PTO and failing to exercise the duty of good faith. That is the linchpin of their claim, of their Walker Process claim, and that is the trigger to get the damages that they need. Then they have B, they say improper listing it in the Orange Book, engaging in sham litigation. D is prolonging the impact through settlement agreements. And then here's what they say in E, negotiating settlements with subsequent generic applicants, that's TEVA, to preserve and protect its monopoly. In other words, as framed in this part of the case, not in their market allocation, not in their restraint of trade part of the case, but as framed in their Walker Process claim, the settlement agreement simply preserved and protected the monopoly. But how did they get the monopoly? They got the monopoly, as they allege, by obtaining the patents, by misleading the PTO. So I would suggest, Your Honor, that their argument that what is left behind in this case is actually a reverse payment claim makes no sense. There is clearly a Walker Process claim. I think that's really the only claim, and that's what they represented to the court. Even if you think, though, that there are two claims... That's what they represented to the court? That the only claim they had was Walker Process? They represented that the only thing left, they said, it terminates litigation. That's just a 54-B statement. Correct. Nothing left. They said none of the issues plaintiffs seek to bring before the Third Circuit with regard to count two, the reverse payment, overlap with the remaining claim in the case, the Walker Process claim. And I think that's just a fair reading of their complaint. But the most critical thing is, even if you think that there are reverse payment issues that rise to the level of a claim, it still doesn't get rid of the fact that there is a Walker Process claim as pled in the complaint, which gives them a damages period longer than they could get for all of the non-patent issues. And that, under Christiansen, again, is the trigger for exclusive Federal Circuit jurisdiction. Thank you very much. Thank you. Two minutes and 36 seconds. All right. Thank you, sir. With a question. You've done good. Thank you, Your Honors. To pick up on the point that was being discussed about schemes and what happens in various remand scenarios, I would first of all, Judge Fischer, to respond to your question, even if you reversed on the merits with respect to the activist claim, and now we're back at the district court level with respect to count one, the monopolization count, now we're back to more or less what we were talking about in the Lipitor discussion. Now you're into the inquiry of do those instrumentalities of wrongdoing qualify as claims for jurisdictional purposes under Christiansen and the other authority, or are they just theories underneath some monopolization claim? I would submit that, in that scenario, those two arguments or sets of allegations would qualify as distinct claims, for the reasons that we talked about, that they have very different operative facts. As Mr. Lefkowitz was pointing out repeatedly, very different forms of relief available were one to succeed. And simply saying, well, they're all linked together because I've said it's a scheme. The courts are very clear. You have to look at the substance. And if what you have in front of you is a it walks like a duck and it talks like a duck and quacks like a duck claim, very different bodies of law, very different facts relate to, you can have a scheme that comprises multiple different independent causes of action. And here, with respect to Walker process, as in Lipitor, very different time frames, very different body of law by which it's evaluated, obviously hardcore patent issues. Isn't that really your theme? Pardon me? Isn't that really your theme, what you just said? Yes, Your Honor, yes. And I would also, to just address the gun versus mitten issue, which has been raised about whether Walker process anymore qualifies as a substantial enough patent issue, first of all, and we cite at least one case in our papers, certainly post-gun, the Federal Circuit has continued to evaluate Walker process cases. The fact of the issues raised in the gun case, very different than what we have at issue here. There was a very significant issue in gun about the state versus federal interests. There you had a legal malpractice claim. It was a very backward-looking, almost hypothetical, what would have happened in a world if the patent lawyer hadn't made a mistake. And the court said, well, you know, the state court has a very significant interest in regulating legal malpractice within the state. So, and these are kind of hypothetical patent issues. Very different what we're inquiring about here, which is the issue of federal circuit versus regional circuit jurisdiction. And it is very clear that the Federal Circuit is constituted to provide uniform expert, you know, kind of stewardship over issues just like the Walker process, the sham enforcement, those theories. When you read these complaints, they read like a patent law complaint. If they're 100 pages, 85 pages are hardcore patent issues being presented. And so when you look at the substance, when you look at the relief available, setting aside altogether these issues around 54B, I would submit that these claims arise under the Walker process, the sham enforcement arise under the patent laws are sufficiently distinct claims that raise significant and substantial patent law issues. And I would bring the court back to the Cipro case, the Ritz-Cammer case decided by the Federal Circuit, was a case that I think is instructive here. The court took the appeal, and there was a, it was an issue of standing. The court took, Federal Circuit took the appeal, and the claims at issue were Walker process fraud and various other claims including misappropriation of know-how and trade secrets that did not involve patent issues. All underneath a monopolization count. And the court without question took jurisdiction over that appeal. The Federal Circuit did. And just like in Cipro, Federal Circuit took jurisdiction over a reverse payment claim. Why? Because there was Walker process allegations in the underlying complaint. Thank you very much. Thank you. Mr. Epstein, I think you deserve some time, did you not? Yes, I did. Thank you, Your Honor. I just have a few points that I'd like to make. Mr. Lefkowitz referred to some statement that you made to the district court in the end that all you're left with is, in effect, a Walker process claim. Is that correct? Well, that's actually exactly where I wanted to start. Okay. I think he read the language. I think he misconstrued what it meant, and I'd like to begin there. The sentence that he pointed to was in our Rule 54B motion. And the sentence that Mr. Lefkowitz read was that none of the issues plaintiffs seek to bring before the Third Circuit with regard to Count 2, and that's referred to as the reverse payment claim, overlap. And then it says with the remaining claim in this case, Count 1, the Walker process claim. And that's exactly our point, is after Judge Sheraton's decision, the only thing remaining were Walker process theories. That claim became, in effect, a Walker process claim. You just said a Walker process claim before you said theories. Well, but it's a yes, and I meant to there, because after Judge Sheraton's decision, the only theories that were left in Claim 1 were patent theories, and in effect became a Walker process claim. But that's not what it was when it was pled. I'm talking about after Judge Sheraton's opinion. There's no way to read Claim 1 to be a Walker process claim before Judge Sheraton acted. I mean, the defendants are just reading out of Claim 1 at least two-fifths of the conduct. We have two other theories that are plainly stated in Claim 1 that involve settlement conduct. And you have to look at the claim as pled. And I want to address the issue that Mr. Milne raised, which was what's the substance of our claim? The substance of Claim 1, the monopolization claim, is specifically pled to begin with the conduct under the patent. I mean, when we present this claim in our complaint and the way we intend to make the case at trial, if this court is to reverse on the merits of the reverse payment claim, reverse payment theory, we want to begin with what Wyeth did to get this patent. We say it's improper. What it did when it listed the patent, what it did when it sued on the patent, and then when it became clear that it wasn't going to win on that theory under the patent. It then settled with Teva, and then it settled with all the other 16 other generic companies. We want to present that entire course of conduct, show that it was designed to delay generic effects, and that's the substance of the claim that we bring under Claim 1. With respect to this issue about – and I see my time is up. I just have a few more short points that I'd like to make, if I can. The idea that the damages change when some of the theories drop out, that's always true in an overall scheme claim. You might need certain elements of a scheme to get the entire period of damages. You might shorten up that period if you lose on some of the theories, and that issue was directly addressed in the DDAVP case where the court said that doesn't matter with respect to jurisdiction. So if this court were to adopt Mr. Lefkowitz's argument about the damage period, it would be clearly in conflict with the Second Circuit and DDAVP. The Cipro case was much different. The Cipro case involved a standalone Walker process claim. It was not an overall scheme claim, and that standalone Walker process claim is what caused that case to go to the Federal Circuit, to be sent to the Federal Circuit. And just briefly, we focused on what was said in the Rule 54b motion itself. As Mr. Sorensen pointed out, before that Rule 54b motion was brought, the plaintiffs explained multiple times in the district court what Claim 1 was about. We sent a letter on August 21, 2012, explaining what was in Claim 1, and this letter appears in the Joint Appendix at page 1375. And at page 1377 of the letter, we explained exactly what Claim 1 or Count 1 and Claim 2 or Count 2 was. We said that plaintiffs have not brought a patent claim. They have brought two antitrust claims for violations of Section 2, Count 1, and Section 1, Count 2 of the Sherman Act. And then we said neither claim necessarily depends on the patent laws because each can rest on non-patent theories. And then we said the same thing when we opposed a motion for a stay, and this is at page 1383 of the Joint Appendix. It's the plaintiff's consolidated opposition to the defendant's motion to stay. At page 1406 of the Joint Appendix, we explained the same thing that I'm arguing today. We said, first, as plaintiffs explained previously, any appeal in this litigation must be heard by the Third Circuit. The mere presence of a patent fraud or sham litigation allegation does not mean plaintiffs' claims arise under patent law. The plaintiffs have at least one theory independent of patent law. Wyeth and Teffa, again, mistake plaintiffs' patent fraud theory for a separate claim. So this has been a consistent theme to our case. We've always referred to Count 1 or Claim 1 as a monopolization claim. This isn't something new. It's not something that we waived when we filed the 54B motion. Thank you very much. Thank you. Once again, I'd ask if counsel would get together and have a transcript prepared. Thank you very much for very well-presented arguments. We'll take a matter of advisement.